DEBORAH A. PURNELL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Purnell v. Commissioner
Docket Nos. 19693-84, 6444-85, 18435-85, 18876-85, 20441-85
United States Tax Court
T.C. Memo 1992-289; 1992 Tax Ct. Memo LEXIS 305; 63 T.C.M. (CCH) 3037; May 18, 1992, Filed *305 Decisions will be entered for respondent in docket Nos. 20441-85, 6444-85, and 18435-85. Decisions will be entered pursuant to Rule 155 in docket Nos. 19693-84 and 18876-85. Deborah A. Purnell, Kathy D. Purnell, Natalie P. Purnell, and Terry W. Sims, pro sese. Lynda Cheung and Fera Wagner, for respondent. BUCKLEY
BUCKLEY
MEMORANDUM OPINION BUCKLEY, Special Trial Judge: These consolidated cases were assigned pursuant to the provisions of section 7443A(b)(3) [2] and Rules 180, 181, and 182. Respondent determined deficiencies in Federal income taxes as follows: Petitioner
Docket No.
Year
Deficiency
Additions to tax
Sec. 6653(a)
Deborah A.
Purnell 19693-84
1980
$ 1,972
$ 98.60 Terry W.
Sims 20441-85
1980
1,006
50.30
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
2,647
$ 132.35
[1]
1982
3,002
150.10
[1]
Kathy D.
Purnell 6444-85
1982
426
21.30
[1]
Natalie P.
Purnell 18435-85
1982
350
17.50
[1]
Deborah A.
Purnell 18876-85
1981
1,877
93.85
[1]
1982
3,027
151.35
[1]
*306 Residence of petitioners at time of filing petition. Deborah A. Purnell resided at Los Angeles, California, when she filed her petition at docket No. 19693-84, and at West Covina, California, when she filed her petition at docket No. 18876-85. Terry W. Sims resided at Los Angeles, California, Natalie P. Purnell at North Long Beach, California, and Kathy D. Purnell at Carson, California, when they filed their respective petitions. The main issue in each case is whether petitioners made contributions to the Kingdom of God Headquarters Church, and, if so, whether such contributions are deductible as made to an exempt organization. We also consider whether, if the amounts are not deductible, petitioners are liable for additions to tax for negligence. In addition, respondent requested that damages be awarded to the United States pursuant to section 6673 in each of the docketed cases. Lastly, some of the petitioners have unrelated issues which we consider separately at the end of this opinion. For ease of presentation, we deal separately with the tax status of the Kingdom of God Headquarters Church and the question whether contributions thereto have been substantiated. Some *307 of the facts have been stipulated and they are so found. Petitioners Deborah A. Purnell, Kathy D. Purnell and Natalie P. Purnell are the biological children of Eugene Emmanuel Purnell. Eugene Emmanuel Purnell, sometimes referred to as Emmanuel, is the pastor and leader of a group called The Kingdom of God Headquarters Church, referred to hereafter from time to time as the Kingdom. Terry W. Sims is not related to the Purnells. All petitioners are members of the Kingdom. Our first task is to consider the nature of the Kingdom. Petitioners contend that the Kingdom is a church, for which a formal request for tax exemption is not required. Respondent contends that the Kingdom is not a qualified entity under section 170(c)(2), and that in any event petitioners have failed to substantiate their claimed deductions. Respondent characterizes the Kingdom as "an anti-Sematic [sic], tax-protestor organization * * * not organized and operated exclusively for religious or charitable purposes". The Kingdom, which is not incorporated, has never sought a Federal tax exemption under any provision of the Internal Revenue Code. The Kingdom occupies certain leased office property which serves *308 as an office and meeting place for the Kingdom. In its office, which consists of three rooms, the Kingdom has telephone service which is listed in the name of petitioner Terry Sims. The listing in the name of petitioner Sims was in order to enable the Kingdom to take financial advantage of the fact that Mr. Sims is an employee of the telephone company. The office space also contains a printing press and various other items used by the Kingdom in order to print and publish its numerous books, pamphlets, bumper stickers, and broadsheets. The Kingdom has only two staff persons, the secretary, Ms. Tolson, and Emmanuel. All petitioners assist in the operations of the Kingdom. Emmanuel was born in Memphis, Tennessee, and as he put it, "almost raised in the Baptist Church". He studied the Old and the New Testament and set out in search of the Kingdom of God on earth. He commenced writing about his views as to the definition of love, of spirit, of the heart, of the soul, and of the mind, in the mid-1950s. Sometime in 1979 he issued "Words of Life with Scientific Meanings, Book I". He believed that there were certain barriers to heaven on earth and believed that he had a scientific *309 approach to eliminating such barriers. Along this line, Emmanuel has written, and the Kingdom has published, several books setting forth Emmanuel's views on various religious subjects. Thus, in March 1981, "Words of Life with Scientific Meanings, Book for 'Babes'" was published. This book sets forth his discussion of God, the Devil, Heaven, the World, Spirits, and so forth. Another version of "Words of Life" was published in 1982, extensively expanding upon the 1981 book. The 1982 book discusses how the Kingdom of God is unlike other governments. Among other things, Emmanuel writes that the Kingdom of God recognizes God as the creator/maker/ruler and owner of all nature, laws, persons, lands and things, while all other governments recognize man as the creator/maker/ruler and owner of nature, laws, persons, lands and things; the Kingdom of God abolishes all world cults and divisions as nations, classes, races, religious denominations, castes, marriages and families; it nullifies, condemns and abolishes all use of money, taxes, debts, and mortgages. Emmanuel writes that the Ten Commandments are not the law of God but are of men; and that man and woman are inherently equal. In *310 a book entitled "Gods Eternal Kingdom, Law and Judgments", Emmanuel points out, inter alia, that all taxation is unjust, sinful, and criminal, and that all entities and persons, including pharaohs, kings, judges, presidents, and politicians, who are guilty of helping to conceptualize, initiate, impose, enforce, collect or uphold any taxation, must receive condemnation in hell. In the same book, "GOD'S JUDGMENT AGAINST JUDAISM/PHARISAISM" (page 43) Emmanuel states as follows: All leaders, followers and surrogates of the synagogue and state marriage/combine of Judaism/Pharisaism, past and present; including, but not restricted to, Prophets, Elders, Judges, Kings, Chief Priests, Rabbis, Teachers and Co-Religionists, who have Identified and who now Identify With, Obey, Support, Defend, or Help to Uphold, Judaism/Pharisaism, intentionally, MUST NOW BE CONDEMNED IN HELL for such EVIL WORKS, says the Lord Jesus. * * *
In addition to the books of beliefs published by the Kingdom, it has also published various bumper stickers with sayings such as "LOVE IS DOING GOOD; NAMELY, SERVING GOD'S KINGDOM ON EARTH!". It has published posters on various subjects which adherents to *311 the Kingdom have attempted to post in various places, including public schools and mental health facilities, and has prepared plaques containing various religious subjects. The Kingdom has but two staff persons, Emmanuel and Ms. Ardythe Faye Tolson (sometimes referred to as Angel Faye). Only Ms. Tolson receives a salary for her services. She functions as the secretary, keeps track of finances, pays the bills, prepares the books for printing, and similar duties. The Kingdom has the lease on the office in its own name, as well as an automobile. It obtains printing supplies for the books and other items in its own name. It does not maintain a checking or savings account, and contributions to it are made in cash. Further, it pays its bills, including rent, in cash, or, if necessary, by money order. Ms. Tolson lives in the office suite of the Kingdom, as does Emmanuel. The Kingdom pays for food, clothing, and vehicle costs for the Kingdom staff. None of the petitioners utilized the automobile or other assets of the Kingdom for their personal use. In addition to religious meetings, which were held at the office suite in 1981, the Kingdom also holds services weekly on Sundays *312 at the Masonic Hall at 45th and Western Streets in Los Angeles, California. However, in essence, the Kingdom is a street church, setting up its displays in various public spaces, and Emmanuel preaches to anyone he can interest in the message. Thus, for some part, the Kingdom is a church without walls. If anyone is interested in any of the books or other literature of the Kingdom, they are requested to make a contribution; lacking funds to do so, the publications are given to them without cost. While the congregation of the Kingdom is small, it does consist of persons other than members of the Purnell family. We consider first whether the Kingdom is exempt from Federal income taxes. Tax status of the Kingdom of God. Section 170(a) allows the deduction, subject to certain limitations, of any charitable contribution made during a taxable year. Section 170(c) defines a charitable contribution as a contribution or gift to or for the use of "(2) A corporation, trust, or community chest, fund, or foundation -- * * * (B) organized and operated exclusively for religious * * * purposes * * *". Further, section 170(b)(1)(A) in setting forth percentage limitations on charitable contributions, *313 expressly refers to "(i) a church or a convention or association of churches". We consider whether the Kingdom is a church. We consider the meaning of the word "church". We stated in Foundation of Understanding v. Commissioner, 88 T.C. 1341, 1356 (1987): "The term 'church' is not defined in the Internal Revenue Code. Nor are the regulations promulgated under section 170 helpful in deciding what is a church. They simply restate the statutory language of section 170(b)(1)(A)(i). Sec. 1.170A-9(a), Income Tax Regs. It seems clear, however, that Congress intended that the word 'church' have a more restrictive definition than the term 'religious organization.'" [Fn. ref. omitted.] We stated the test in Spiritual Outreach Society v. Commissioner, T.C. Memo. 1990-41, affd. 927 F.2d 335 (8th Cir. 1991), as follows: Although fundamental to determining whether an organization is a church, religious purposes alone do not serve to establish it as a church. Equally important are the means by which its religious purposes are accomplished. We take a common sense approach and posit our conclusion on the meaning of "church" in ordinary, *314 everyday parlance. The word "church" implies that an otherwise qualified organization bring people together as the principal means of accomplishing its purpose. Chapman v. Commissioner, 48 T.C. 358, 367 (1967) (Tannenwald, J., concurring). See also Foundation of Understanding v. Commissioner, 88 T.C. at 1357, quoting from American Guidance Foundation, Inc. v. United States, 490 F. Supp. 304, 306 (D. D.C. 1980), affd. without opinion (D.C. Cir. July 10, 1981) ("At a minimum, a church includes a body of believers or communicants that assembles regularly in order to worship"). Thus, a church is a cohesive group of individuals who join together to accomplish the religious purposes of mutually held beliefs. "In other words, a church's principal means of accomplishing its religious purpose must be to assemble regularly a group of individuals related by common worship and faith. * * * To qualify as a church, an organization must serve an associational role in accomplishing its religious purposes." Church of Eternal Life v. Commissioner, 86 T.C. 916, 924 (1986). * * * [Fn. ref. omitted.]
The determination *315 of what constitutes a church is thus primarily a factual determination. The burden of proof is upon the petitioners to show that respondent's determinations are incorrect in this regard. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Although respondent's rationale is not entirely clear in this case, we assume her contention to be that the Kingdom does not satisfy the associational requirement, and that it fails to meet the bulk of the 14 criteria used by respondent to identify organizations which qualify for church status. Although we have declined to adopt respondent's 14 criteria as a test for determining what constitutes a church, we have stated that they are helpful in deciding what is essentially a factual question. Foundation of Understanding v. Commissioner, supra at 1358. Respondent's criteria were first announced in a speech by former Commissioner Jerome Kurtz. See Remarks of IRS Commissioner Jerome Kurtz, PLI Seventh Biennial Conference on Tax Planning (Jan. 9, 1978), reprinted in Fed. Taxes (P-H) par. 54,820 (1978). The criteria are: (1) a distinct legal existence; (2) a recognized creed and form of worship; *316 (3) a definite and distinct ecclesiastical government; (4) a formal code of doctrine and discipline; (5) a distinct religious history; (6) a membership not associated with any other church or denomination; (7) a complete organization of ordained ministers ministering to their congregations; (8) ordained ministers selected after completing prescribed courses of study; (9) a literature of its own; (10) established places of worship; (11) regular congregations; (12) regular religious services; (13) Sunday schools for the religious instructions of the young; and (14) schools for the preparation of its ministers. [See Internal Revenue Manual 7(10)69, Exempt Organizations Examination Guidelines Handbook 321.3(3) (Apr. 5, 1982).]
In considering these various criteria, we note the following regarding the Kingdom. It does not have a distinct legal existence, it does not at this point in its existence have a definite and distinct ecclesiastical government, it does not have an organization of ordained ministers, nor does it have schools for the preparation of its ministers. The Kingdom does have a creed and form of worship, a formal code of doctrine and discipline, a literature *317 of its own, established places of worship, both regular and irregular congregations, and regular religious services. There was no testimony presented as to whether it held Sunday school for religious instruction of the young. As for schools for the preparation and ordination of its ministers, one of the tenets of the Kingdom is that ordination can only come from God, not from any human being. We hold that the Kingdom does meet the definition of a church. We have arrived at this conclusion keeping in mind that several of its adherents are the children of Emmanuel. They do not, however, constitute its only adherents, and despite their involvement, the Kingdom is more than a one-family church. See, e.g., Foundation of Understanding v. Commissioner, supra at 1360. The Kingdom has an extensive body of religious doctrine. We have set forth some of the written positions of the Kingdom above, particularly in regard to taxation, which Emmanuel testifies are aspirational in nature. We find that the Kingdom is not a sham created solely for tax purposes. Petitioners objected to some of respondent's questions on cross-examination, contending that the Court was *318 allowing an interference into the Kingdom's free exercise of its religion. We overruled such objections, however, since the questions were directed almost entirely at an attempt to ascertain if in fact there was an established set of religious beliefs, perhaps one of the most essential elements in ascertaining whether an organization is a church. In no regard do we express any view as to the validity or truth of such beliefs. In our opinion in Foundation of Understanding v. Commissioner, supra at 1356 we stated: In the absence of guidance by Congress and a meaningful regulatory definition, it has been suggested that the term "church" is to be interpreted in light of the generally accepted meaning and usage of the word. De La Salle Institute v. United States, 195 F. Supp. 891, 903 (N.D. Cal. 1961). However, given the plurality of religious beliefs in this country, the validity of this approach is not without doubt. See American Guidance Foundation, Inc. v. United States, supra at 306. We can only approach this question with care for all of us are burdened with the baggage of our own unique beliefs and perspectives. *319 We must recognize that one person's prophet is another's pariah. Consequently, we must also assiduously avoid expanding our inquiry into the merits of petitioner's beliefs or risk running afoul of First Amendment religious protections. * * *
Our only comment, therefore, is that the Kingdom has an established system of religious teachings and beliefs, one of the criteria to consider in arriving at our conclusion that it is a church. We turn now to the question of contributions made by the individual petitioners. Deborah Purnell. Petitioner claimed that she contributed $ 12,500 to the Kingdom during 1980, $ 9,900 during 1981, and $ 14,000 during 1982, all of which contributions were made in cash since she did not have a checking account during any of the years in question. At the commencement of these proceedings, we advised this petitioner, as well as all the others, that she bore the burden of proving that in fact she made the contributions in question. Ms. Tolson was the keeper of the financial records for the Kingdom, and she testified that petitioner had in fact contributed an amount greater than claimed in each year. We do not believe this to be true. For instance, *320 during 1980, petitioner reported total income from wages in the amount of $ 20,333, plus $ 120 in unemployment benefits. From this amount she had the following amounts deducted from her paycheck: Federal income tax withheld
$ 2,787
State income tax withheld
856
F.I.C.A. tax
1,246
Calif. disability insurance
203
Total
5,092
In addition, petitioner claimed child care expenses for her son Enoch in the amount $ 1,820. When the child care and withheld amounts are combined, the total of $ 6,913 would leave petitioner with $ 13,420 during the year to cover costs of food, lodging, and other living expenses for her and her son. We simply cannot believe under these facts that petitioner made a contribution totaling the claimed $ 12,500 to the Kingdom. She would have been left with less than $ 1,000 to cover her living costs for the entire year. Although questioned about these amounts, petitioner did not contend she had other support assets during this or the other years at issue. As for petitioner's 1981 and 1982 years, the same analysis applies: 1981
1982
Wage income
$ 19,033
$ 27,442
Federal income tax withheld
1,821
2,002
State income tax withheld
633
871
F.I.C.A.
1,266
1,838
Calif. disability ins.
105
140
Payroll withholding total
3,825
4,851
Child Care
2,080
2,500
Total
5,905
7,351
Available funds
13,128
20,091
Claimed Kingdom contribution
9,900
14,000
*321 Petitioner would have available the sums of $ 3,228 and $ 6,091, for 1981 and 1982, respectively, to cover all living costs for herself and her son. We simply do not believe petitioner made the full cash contribution claimed. In arriving at this conclusion, we have considered the receipts for contributions given petitioner by the Kingdom. We do not believe them to be correct. We do, however, find that petitioner made contributions which, considering her income, were substantial to her. We make an estimation of the amounts of these contributions to be $ 500 in each of the years at issue, bearing heavily upon petitioner for her failure to maintain adequate records. See, e.g., Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). We make this estimation keeping in mind that petitioner claimed her father, Emmanuel, as a dependent on her returns in each of the years at issue. As to taxable years beginning after December 31, 1982, we note that section 1.170A-13, Income Tax Regs., provides recordkeeping requirements as to deductions for charitable contributions. Terry W. Sims. We subject the amounts claimed as contributions by Mr. Sims to the same analysis *322 applied to petitioner Deborah Purnell. 1980
1981
1982
Wage income
$ 15,308
$ 20,080
$ 26,960
Federal income tax withheld
2,217
4,112
4,199
State income tax withheld
606
904
1,468
F.I.C.A.
938
1,318
1,806
Calif. disability ins.
114
89
136
Total
3,875
6,423
7,609
Available funds
11,433
13,657
19,351
Claimed Kingdom contribution
4,500
5,000
10,500
Funds remaining for living:
6,933
8,657
8,851
Petitioner presented no evidence to prove that he made the contributions in question. While we suspect that he did make some contributions to the Kingdom, we nevertheless have no evidence in the record to enable us to make an estimation. See Cohan v. Commissioner, supra. Accordingly, petitioner is not entitled to any of the claimed charitable contributions. Petitioner suffered a casualty loss during 1981 when the automobile he purchased in 1979 was destroyed by fire. His purchase price for the automobile was $ 8,682.84, and the unpaid balance at the time of the fire was $ 6,249.96. Petitioner had no insurance. The lienholder, General Motors Acceptance Corporation, relieved petitioner of his unpaid debt of $ 6,249.96 on the *323 automobile after the fire. On his return for 1981, petitioner stated that the fair market value of the automobile before the fire was $ 7,000; fair market value after the fire was $ 473, for a decrease of $ 6,527. From this figure petitioner deducted $ 100 and claimed a casualty loss deduction of $ 6,427. Respondent did not contest petitioner's figures other than taking into account the $ 6,249.96 note amount from which petitioner was relieved of liability, which left petitioner with a loss of $ 177. Section 165(a) provides, in general, for the deduction of losses. It limits deductible losses, however, to that portion of a loss "not compensated for by insurance or otherwise". The settlement by petitioner with General Motors Acceptance Corporation clearly represented a compensation for a portion of the loss measured by his remaining obligation on the automobile. Respondent was correct in reducing the claimed casualty loss deduction. Petitioner also claimed a deduction for legal fees in the amount of $ 800 on his 1982 return. Petitioner presented no evidence whatsoever on this issue, and, accordingly, respondent's disallowance is upheld. Kathy D. Purnell. Petitioner reported *324 the receipt of wages totaling $ 10,245. Additionally, she received $ 720 in unemployment insurance. From her wage income, petitioner had Federal income tax withheld of $ 1,362, State income tax withheld of $ 264, and F.I.C.A. tax of $ 686, for a total of $ 2,312. She also claimed child care expenses of $ 580. Thus, petitioner had available for her living costs $ 8,073 for the entire year 1982. Petitioner claimed contributions to the Kingdom totaling $ 4,500 for 1982, leaving her with the sum of $ 3,573 to support herself and her child Marquecia. We suspect petitioner made some contribution to the Kingdom, but we have no basis upon which we can estimate the amount of her contribution, and, accordingly, respondent's determination is upheld. Natalie P. Purnell. Petitioner claimed a deduction of $ 4,000 to the Kingdom for her year 1982. During that year, petitioner received wages of $ 12,475, from which Federal income tax was withheld in the amount of $ 1,076, State tax of $ 246, F.I.C.A. of $ 836, and State disability insurance of $ 100. When the withheld amounts totaling $ 2,258 are deducted from petitioner's wages, she was left with the sum of $ 10,217 for the year from *325 which she paid child care costs of $ 1,800. She thus was left with the sum of $ 8,417 with which to support herself and her two children. Out of this amount she claimed to have contributed $ 4,000 to the Kingdom. We suspect that she made some contribution to the Kingdom, but we have no basis whatsoever upon which to make an estimation of her contribution. Accordingly, respondent's disallowance in this regard is upheld. Additions to tax for negligence. Petitioners failed to produce any evidence on this issue. Accordingly, respondent's determinations in this regard are upheld. Sanctions under section 6673. Respondent requested sanctions under section 6673 in regard to each of these petitioners. On this record we decline to impose any sanctions. For the reasons stated above, Decisions will be entered for respondent in docket Nos. 20441-85, 6444-85, and 18435-85. Decisions will be entered pursuant to Rule 155 in docket Nos. 19693-84 and 18876-85. Footnotes
1. Cases of the following petitioners are consolidated herewith: Kathy D. Purnell, docket No. 6444-85; Natalie P. Purnell, docket No. 18435-85; Deborah A. Purnell, docket No. 18876-85; Terry W. Sims, docket No. 20441-85.↩
2. Section references are to the Internal Revenue Code in effect for the years at issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency. ↩